UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

UNITED STATES OF AMERICA,

          – against –

YOUSEF ENNAB AND MOHAMED HASSAN,

                    Defendants.

------------------------------------------------------------- X

:
:
:
:   **MEMORANDUM DECISION AND ORDER**
:
:   22-CR-464 (AMD)
:
:
:

**ANN M. DONNELLY**, United States District Judge:

      The defendants, professional pharmacists, were convicted after a three-week jury trial of dispensing and distributing and conspiring to dispense and distribute oxycodone.  The evidence at trial established that the defendants and others — a medical office manager, other pharmacists and street level drug dealers — conspired to push over one hundred thousand oxycodone pills onto the street by filling bogus prescriptions and selling them to dealers.

      Before the Court are the defendants' motions pursuant to Federal Rules of Criminal Procedure 29 and 33 for a judgment of acquittal, or, in the alternative, for a new trial.  (ECF Nos. 394, 395, 399-1, 399-2.)  As explained below, the motions are denied.

## BACKGROUND

### I.    Indictment

      The defendants were charged in a superseding indictment with conspiring to distribute a controlled substance, contrary to 21 U.S.C. § 841(a), and in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C) (Count 1); conspiring to dispense a controlled substance, contrary to 21 U.S.C. § 841(a), outside the scope of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C) (Count 4); and the substantive distribution and dispensation offenses underlying those charges — that they each distributed, dispensed, or

possessed with intent to distribute or dispense oxycodone outside the scope of professional

practice (Count 2, as to Hassan; Count 3, as to Ennab).  (ECF No. 179; ECF No. 321-2.)[1]

## II.     Trial

### a.     The Government's Case

Oxycodone, a Schedule II controlled substance, is highly addictive and can cause

overdose or death.  (Trial Transcript ("Tr.") 1061–63.)  Because it is so dangerous, oxycodone

should be prescribed only "for three to five days;" a doctor treating a patient who has never taken

opioids before "needs to start with the lowest dose because that's how powerful it is."  (Tr.

1061–62.)  The FDA requires a "black box" warning for pharmacists and prescribers cautioning

that oxycodone is dangerous and should be prescribed only for a short period of time at the

lowest dose possible.  (Tr. 1064–65.)  Pharmacists and prescribers are also required to advise

patients about the dangers of taking oxycodone.  (Tr. 1065.)  Oxycodone 30 mg pills are "the

most popular by demand on the street."  (Tr. 927.)

Testimony from government and defense experts established that pharmacists and

prescribers are trained to look for "red flags" — signs that oxycodone is being "diverted," or sold

on the street.  According to Government expert Carmen Catizone, the former CEO of the

National Association Boards of Pharmacy, red flags suggest that a "prescription is not

legitimate" (Tr. 1069), and controlled substances like oxycodone are an "immediate red flag"

(Tr. 1075)  In addition, pharmacists and prescribers should be alert to the following warning

signs:

- using slang to describe a medication;

- paying for prescriptions with cash;

---

[1] References to count numbers are to the trial indictment.  (*See* ECF No. 321-2.)

- geographic distance between the patient's address and the pharmacy or the provider;

- multiple patients with the same contact information and the same last name prescribed the same controlled substance from the same provider; and

- "pattern prescribing," where multiple patients are prescribed the same drugs in the same quantities by the same provider.

(Tr. 1071–74.)

Defense expert Andrew Perugini explained that a practitioner who prescribes the same controlled substance in the same dosage for patients who filled prescriptions at a particular pharmacy is a red flag. (Tr. 1714.) Multiple patients at the same pharmacy filling prescriptions for controlled substances with the same phone number is also a red flag. (Tr. 1717.) Both experts agreed that as the number of red flags increases, a pharmacist's concerns about diversion should also increase. (Tr. 1070, 1710.) One way for a pharmacist to resolve red flags is to call the prescribing doctor to verify that the prescription is legitimate. (Tr. 1046, 1710.)

The Prescription Monitoring Program ("PMP"), a database that tracks prescriptions for controlled substances, is another resource for pharmacists to confirm or resolve red flags. (Tr. 1047–49.) Doctors and pharmacists enter information into the PMP when they prescribe or dispense controlled substances. (Tr. 1047.) This creates a record, shared across pharmacies, of the controlled substances a patient is taking. (Tr. 1047–48.) The PMP also contains information about how often a patient is prescribed the controlled substance, whether the patient is also going to other pharmacies, the number of doctors the patient is seeing, and whether the patient is paying for medications in cash or with insurance. (Tr. 1048.) Pharmacists are supposed to check the PMP before dispensing a controlled substance. (Tr. 1048.)

The defendants learned about red flags in pharmacy school, including in Professor John Bova's class, which included the study of laws, regulations, and rules for pharmacists. (Tr. 974–982, 991.) Professor Bova covered the "red flags" for narcotics like oxycodone that are prone to abuse: "A patient or caregiver that picks up multiple prescriptions from multiple patients on the same day, a prescription written by a prescriber . . . in one borough a far distance from the patient and a far distance from where the prescription is being filled at the pharmacy, perhaps prescriptions that are for a long duration of therapy, [and] prescriptions outside the scope of practice of the person writing it." (Tr. 991, 995–96.)[2]

Leticia Smith was the office manager and receptionist at Linden Medical Center in Brookyln, where Dr. Somsri Ratanaprasatporn, a general practitioner, saw patients. (Tr. 328–329.)[3] Dr. Ratanaprasatporn was Smith's pediatrician, and Smith was a teenager when she started working for the doctor. (Tr. 345–46.) Smith became the full-time office manager sometime in 2019. (Tr. 347.) From 2018 through 2022, Smith used Dr. Ratanaprasatporn's electronic prescription pad, without the doctor's knowledge, to write and issue thousands of prescriptions for 30 mg tablets of oxycodone in Dr. Ratanaprasatporn's name and license, in exchange for cash. (Tr. 329–330; 359; 365.) Dealers or "crew chiefs" — Michael Kent, Anthony Mathis, and Raymond Walker — paid Smith to issue the oxycodone prescriptions in the names of "patients" that the crew chiefs supplied. (Tr. 332.) Then, the crew chiefs picked up the

---

[2] Professor Bova, like the other experts, also testified that cash payment is a red flag. (Tr. 993–94.)

[3] Smith pled guilty to conspiracy to distribute oxycodone and money laundering on September 21, 2023, and testified pursuant to a cooperation agreement. (*See ECF Minute Entry dated Sep. 21, 2023*; Tr. 338–39.) She is awaiting sentence. Dr. Ratanaprasatporn pled guilty to conspiracy to obstruct justice and conspiracy to unlawfully use a registration number to issue oxycodone prescriptions on August 6, 2024, and was sentenced to time served. (*See ECF Minute Entry dated Aug. 6, 2024*; *ECF Minute Entry dated Mar. 26, 2025*.) At the time of sentence, she was in her late 70s and in the early stages of dementia. At trial, witnesses referred to her as Dr. Somsri and Dr. Ratana. (*See, e.g.*, Tr. 329.)

prescriptions from pharmacies and sold the oxycodone on the street.  (Tr. 332–333.)[4]  Dr. Ratanaprasatporn never examined these people, and they were not her patients.  (Tr. 359.)  Kent and the other crew chiefs also referred patients whom Dr. Ratanaprasatporn examined, and Smith issued illegitimate prescriptions for them, too.  (Tr. 677, 713.)

The crew chiefs found the pharmacies to dispense the oxycodone, and told Smith where to send the prescriptions.  (Tr. 398–399.)  Hassan had an ownership interest in pharmacies that filled the bogus prescriptions: Nile Rx Pharmacy, Nile City Pharmacy, Prospect Care Pharmacy, Downtown Rx Pharmacy, and Forest Care Pharmacy.  (GX 261.)  Ennab was the part owner and supervising pharmacist at Forest Care, and had previously worked at another one of Hassan's pharmacies.  (GX 261; GX 364; Tr. 1240.)[5]

Bassam Amin, Hassan's partner at Prospect Care pharmacy during the conspiracy period, also worked at Nile Rx and Nile City.  (Tr. 1201, 1208.)[6]  According to Amin, Hassan monitored his pharmacies "very closely," and had remote access to the stores' computer systems.  (Tr. 1217, 1237.)  Hassan and Amin split the profits from Prospect Care evenly.  (Tr. 1217.)  Amin and other pharmacists and technicians who worked at Hassan's pharmacies were part of a WhatsApp group chat called "Pharmacists United."  (Tr. 1209–10.)  Ennab, Omar Elsayed, who

---

[4] Kent pled guilty to conspiracy to distribute oxycodone on September 6, 2023, and was sentenced to 108 months in prison and three years of supervised release.  (*See ECF Minute Entry dated Sep. 6, 2023*; *ECF Minute Entry dated Oct. 29, 2024*.)  Mathis pled guilty to conspiracy to distribute oxycodone on September 25, 2024, and is awaiting sentence.  (*See ECF Minute Entry dated Sep. 25, 2024*.)  Walker pled guilty to conspiracy to distribute oxycodone on October 15, 2024, and was sentenced to eighty-four months in prison and three years of supervised release.  (*See ECF Minute Entry dated Oct. 15, 2024*; *ECF Minute Entry dated May 7, 2025*.)

[5] Forest Care's legal name was Brighton Care.  (GX 261 at 14.)

[6] Amin pled guilty to conspiracy to distribute oxycodone on February 15, 2024, and testified pursuant to a cooperation agreement.  (*See ECF Minute Entry dated Feb. 15, 2024*; Tr. 1300–03.)  He is awaiting sentencing.  Smith referred to Amin as "Sam."  (*See* Tr. 335 ("Prospect Care pharmacist's name was Sam.").)

was the pharmacist at Downtown Rx, and Mohamed Saleh, the pharmacist at Nile City, participated in the chats.  (Tr. 334–36, 837–38, 1209–1210, 1230–31.)[7]

Amin met Kent at Nile Rx when Kent came to pick up an oxycodone prescription.  (Tr. 1244.)  Kent paid in cash, which Amin thought was suspicious because it suggested Kent was not using the medication himself.  (Tr. 1244–45.)  In late 2019 or early 2020, Kent came to Prospect Care regularly.  (Tr. 1245–46.)  The visits followed a pattern.  Kent called Amin, said that he had prescriptions from Dr. Ratanaprasatporn's office, and asked when they would be ready.  (Tr. 1247.)  Then, Kent picked up multiple prescriptions at once.  (Tr. 1249.)  Kent wanted only blue oxycodone pills.  (Tr. 1250.)  Although Amin knew that at least some of the oxycodone that he gave to Kent would not be delivered to the patients for whom it was prescribed, he agreed to fill the oxycodone prescriptions for Kent, because he was worried about Prospect Care's finances.  (Tr. 1243–44, 1249–50.)

Hassan also knew Kent and met with him at Prospect Care in 2022.  (Tr. 1252–53.)  Amin and Hassan split the cash Kent paid for the prescriptions evenly.  (Tr. 1260; GX 514; GX 547.)  Because cash payments for drugs like oxycodone were red flags that could alert regulators, Hassan showed Amin how to make fake insurance profiles to hide the fact that Kent was paying cash for the oxycodone.  (Tr. 1273–1274.)

In February 2020, Hassan wrote in the WhatsApp group chat that "[a]s of this morning I discontinued all of Dr. Somsris [sic] patients in both Nile Rx and Nile Ridge.  If you wish to continue working with patients from that doctors [sic] office in your pharmacy please be diligent

---

[7] Elsayed pled guilty to conspiracy to distribute oxycodone, conspiracy to dispense oxycodone, and the substantive distribution and dispensation offense underlying those charges on January 21, 2025, and is awaiting sentencing.  (*See ECF Minute Entry dated Jan. 21, 2025*.)  Saleh, according to the government, is an unindicted co-conspirator.  (*See* ECF No. 409 at 17.)

in doing PMP checks and id verifications." (GX 617.) Nevertheless, records established that Hassan's pharmacies continued to fill prescriptions from Dr. Ratanaprasatporn's office. (*See* GX 241.)

Smith sent oxycodone prescriptions to Nile Rx when Hassan was the pharmacist there. (Tr. 405, 407–08.)[8] Hassan never called Smith or Dr. Ratanaprasatporn to verify whether the prescriptions were legitimate. (Tr. 408.) He did tell Smith to "make sure" that she sent other prescriptions with the oxycodone, "whether it be a stool softener, an anti-inflammatory, [or] vitamins." (Tr. 408.) If she did not send other prescriptions, Hassan said, "it could get red-flagged." (Tr. 408.) Smith told him that those medications required a doctor's prior authorization, but Hassan — who was not a doctor — said he would "do" it. (Tr. 428–29.) Hassan also suggested to Amin that he ask Kent "to bring in some medication[s] that are highly reimbursable" with the oxycodone prescriptions. (Tr. 1265.) In addition, Elsayed asked Smith to send expensive prescriptions with the oxycodone prescriptions. (Tr. 435–36.) Kent paid Hassan's pharmacies in cash, but the pharmacies also charged certain patients' insurance companies. (Tr. 414.) Thus, Elsayed asked Smith to send prescriptions for insured patients, so that their insurance would cover the cost of the prescriptions. (Tr. 433–434.)

Hassan, Elsayed, and Saleh texted one another about getting more oxycodone patients from Smith and Kent. (GX 1103-2.14; GX 1103-2.15; GX 1103-2.30; GX 1103-3.10; GX 1103-2.33.) Elsayed was concerned that he had too many oxycodone patients. (*See* GX 1103-3.10 ("Just wanted some guidance on dispensing oxy 30s. From what you have seen, when and where is the limit."); GX 1103-2.36 ("I got 5 new pts from leticia yesterday. Too many.").) Hassan reassured him. (*See* GX 1103-2.30 ("Just do PMP and ur good."); GX 1103-3.10 ("Ur good . . .

---

[8] Smith referred to Hassan as "Mohamed 1." (Tr. 334–35.)

U shud [sic] get maybe 3-4 more from dr. somsri. And that's avout [sic] it."); GX 1103-2.36 ("We can start shifting to other stores . . . Inwill [sic] call [Smith] and ask her to send to a diff[erent] store.").)

Smith and Kent coordinated sending more oxycodone prescriptions to pharmacies in which Hassan had an ownership interest, including Prospect Care, Nile City, Downtown Rx, and Forest Care.  (Tr. 410–416, 428, 456–457.)  In May 2022, Smith and Hassan spoke on the phone about starting to send oxycodone prescriptions to Downtown Rx.  (Tr. 421–423.)[9]  Hassan said that "he would accept the oxycodone prescriptions for 30 milligrams at his new pharmacy," Downtown Rx, and asked Smith to meet in person to discuss it.  (Tr. 421–423.)  On June 3, 2022, Kent texted Smith that he went to Downtown Rx to speak with Hassan, but that Hassan was not there, so he left his phone number.  (GX 1112-2.19; Tr. 421.)  Five days later, Elsayed sent Hassan a picture of a note left at Downtown Rx with Kent's phone number that said, "Michael . . . for Ms. Smith."  (GX 1103-2.14.)

Ennab's pharmacy, Forest Care, filled oxycodone prescriptions from Linden Medical beginning in August 2022.  At some point in 2022, Kent told Smith that he would have "no problem" picking up oxycodone prescriptions from the Forest Care pharmacist, who was Hassan's cousin.  (Tr. 457–458.)[10]  Kent also told Amin, who was no longer receiving prescriptions for some of Kent's oxycodone patients, that Hassan told Kent to send the prescriptions to Staten Island or Atlantic Avenue pharmacies.  (Tr. 1238.)[11]  Around the same

---

[9] Hassan referred to himself as "Mohamed from Nile Rx."  (Tr. 760.)  In addition, phone records show that Smith and Hassan spoke several times in June, July and August 2022.  (*See* GX 21 at 2023–34.)

[10] Smith did not know that Ennab was the pharmacist at Forest Care.  (Tr. 514.)

[11] Ennab and Hassan dismiss this testimony as false, and say that the government should have known that it was false.  (ECF No. 395 at 13–15, 18; ECF No. 399-2 at 43.)  The Court addresses these arguments below.

time, Hassan and Kent communicated about sending more prescriptions to Hassan's pharmacies. (GX 1103-2.30 (August 22, 2022 text message from Hassan to Elsayed: "Omar, I spoke to Mike. He will send u four new patients over the next few days.").) On August 22, 2022, within a minute of Hassan reporting to Elsayed that he had spoken to Kent, Kent called Forest Care for the first time. (GX 1103-2.30; GX 924.)

On August 25, 2022, Kent texted Smith that he had an "issue" at Forest Care because the pharmacist tried to give him the "big white" pills, which Kent rejected because he could only sell blue pills. (GX 1112-2.6; Tr. 459–60.) Kent texted Smith that "[m]aybe tomorrow or the next day it'll be ready." (GX 1112-2.6.) Smith replied, "Oh ok lol he knows better than that!!" (GX 1112-2.6.) According to Smith, "the pharmacist at Forest Care" "knew better" because Kent told him that he wanted blue 30mg tablets. (Tr. 460.)

The next day, Ennab texted Kent, "Hey Mike. This is yousef from forest. Once everything comes in I'll give you a call." (GX 1112-1.1.) A few hours later, Kent responded, "… yousef do you think it will be today?" Ennab replied, "Yes it will… I won't be there. But my pharmacist will give it to you." (GX 1112-1.1.) That same day, Forest Care filled three prescriptions for oxycodone from Dr. Ratanaprasatporn's office. (*See* GX 356-1 (prescriptions issued to Vance McMillian, Jennifer Lowman, and Kelvin Chekuse).)

On September 9, 2022, Kent sent Smith images of identification cards for various "patients." (Tr. 506–08; GX 1112-3.13.) Dr. Ratanaprasatporn did not examine any of these people. (Tr. 509–10.) The identifications reflected that the "patients" lived in Brooklyn, so Kent gave Smith fake Staten Island addresses for them, because it would be "pretty strange" for Brooklyn residents to fill oxycodone prescriptions at a Staten Island pharmacy. (Tr. 508–09, 470.) Kent told Smith that he had spoken with the pharmacist at Forest Care, who knew that the

addresses in the patients' profiles would not match their identification cards.  (Tr. 470–71.)  In addition, he told Smith to use his phone number on the prescriptions.  (Tr. 466–67.)  Smith then issued oxycodone prescriptions in these people's names with Kent's number to Forest Care.  (Tr. 509–10, 467.)

On September 10, 2022, Kent texted Ennab that he had three prescriptions "sent over." (GX 1112-1.3.)  Ennab responded, "I'll have them ready tomorrow."  (*Id.*)  Two days later, Kent texted Ennab that he was on his way to Forest Care and sent him pictures of the same identification cards he sent to Smith.  (GX 1112-1.4.)  Ennab did not contact Dr. Ratanaprasatporn's office to verify that the prescriptions were legitimate.  (Tr. 510–11.)  He filled the prescriptions and used the Staten Island addresses, even though the addresses on the identification cards were different.  (*Compare* GX 1112.1-4 *with* GX 911.)

Ennab's interactions with Kent were captured on video footage from the pharmacy, and wiretap evidence, and confirmed by telephone records.  On September 27, 2022, Ennab opened a package, removed prescription bottles, and called Kent.  (GX 125-A.)  Ennab told Kent that they had "a little problem," because the pharmaceutical distributor sent "white ones."  (*Id.*)  Ennab said that he would "try to return the white ones, unless you want them," and that he was "reordering the blue ones right now."  (*Id.*)  Kent called Ennab later the same day, and said, "I know you, you gave me the white ones, but oh, the big ones? . . .  Yeah, I can't do nothing with those."  (GX 127.)  The next day, September 28, 2022, Kent came into the store, walked up to the counter and handed Ennab a wad of cash, which Ennab pocketed without counting or giving Kent change.  (GX 1107-2; GX 11073.)  Ennab then scanned prescriptions, put them in a bag, handed them to Kent, and "fist-bumped" with him.  (GX 1107-2; GX 1107-3.)  Documentary

evidence established that these were three prescriptions for oxycodone for Linden Medical "patients." (*Compare* GX 1106-9 *with* 1107-2 *and* 1107-3.)

Ennab and Kent also discussed moving some of the prescriptions away from Forest Care. In one call, Kent asked "I know you wanted me to take some people out . . . You still want me to do that, right?" (GX 126.) Ennab replied that he did, and Kent said, "I'mma try to move, um, 5 of them out. Is that, is that good enough?" (*Id.*) Ennab responded, "That's perfect." (*Id.*) In another call later that day, Kent confirmed "I'mma move 5 of them out . . . this week." (GX 127.) Ennab replied, "No problem." (*Id.*)

Ennab's pharmacy filled 14 oxycodone prescriptions that Smith issued using Dr. Ratanaprasatporn's credentials. (GX 356-1.) Each prescription was for the same number and dosage of oxycodone — 120 30 milligram tablets of oxycodone — a total of 1,680 pills. (*Id.*) Two of the people in whose names Ennab filled prescriptions — Jennifer Lowman and Latoya Richardson — testified that they had never been prescribed oxycodone, that they did not know Dr. Ratanaprasatporn, and had never been to Forest Care Pharmacy. (Tr. 1522–23, 1577–80.)[12] Nevertheless, Ennab not only filled prescriptions in their names, he represented that he counseled them about the prescriptions. (GX 357.) He also represented that the cost of the oxycodone was charged to patients' insurance, even though Kent paid for the oxycodone in cash. (GX 241; GX 953.)

Together, Hassan's pharmacies filled over 1,000 prescriptions for oxycodone from Linden Medical, totaling over 100,000 pills. (GX 901.) The street value for these pills was over $3 million. (Tr. 929–30 (explaining that in the New York tri-state area, the street value for a 30 mg oxycodone pill is $30).) Catizone, the government's expert, examined data from Prospect

---

[12] Richardson once worked at Mathis's restaurant, and gave him a copy of her driver's license so that he could get her a food handling certification. (Tr. 1576–77.)

Care, Downtown Rx, and Forest Care and identified multiple red flags.  (Tr. 1088, 1090–91, 1111.)  Records showed that Hassan's pharmacies filled prescriptions for oxycodone for multiple "patients" every month, even though oxycodone prescriptions are typically prescribed for only three to five days.  (Tr. 1085–86, 1091, 1093, 1095.)  As for the oxycodone prescriptions from Forest Care, filling those prescriptions would not have been in the ordinary course of pharmacy practice; there were "[m]ultiple red flags concerning the medication, prescriber, and the legitimacy of [the] patient[s]."  (Tr. 1111.)

b.    **The Defense Case**

The parties stipulated that Nerli Guardado, Ennab's classmate in pharmacy school, was a pharmacist at Forest Care.  (Tr. 1889–90.)  Guardado filled the first three oxycodone prescriptions Linden Medical sent to Forest Care.  (Tr. 1890.)  She "was comfortable filling those prescriptions and did not see anything she thought was a red flag or a warning sign."  (*Id.*)

Guardado was at Forest Care when Kent came to pick up prescriptions on September 28, 2022, and was captured on video surveillance footage introduced at trial.  (*See* GX 953.)  In the stipulation, Guardado claimed not to remember Kent, whom she described as "the person in the video wearing a baseball cap who came to the register."  (Tr. 1893.)  She agreed that she "stopped in the aisle and did not approach while the man was at the counter."  (*Id.*)  She did not "have any specific memory of why she stopped and does not remember the events in the video from 2022 . . . [however,] her usual practice is not to interrupt a patient being counseled by a pharmacist or making a purchase, so she [was] not surprised to see[ ] on the video that she did not walk up to the register while the man in the cap paid and signed."  (*Id.*)

According to Guardado, "if a person came into Forest Care and picked up oxycodone prescriptions for multiple patients a few times, it would not necessarily have been a red flag for her."  (Tr. 1891.)  She also said that it was "not uncommon for patients to travel outside of the

area where they live to fill a prescription," and "it was not uncommon for patients to prefer certain sizes of pills or colors of pills." (Tr. 1892, 1897.)

Teresa Wilbert, a retired law enforcement officer, testified about charts she made interpreting data on the oxycodone prescriptions from Linden Medical, and which Hassan's pharmacies dispensed from October 2017 to December 2022. (*See* Tr. 1813–15.)

### c.    The *Geaney* Protocol

Prior to trial, the defendants moved to preclude statements of alleged co-conspirators. (ECF No. 298 at 29–35; ECF No. 301 at 8–10.) The government responded that the statements were admissible pursuant to Federal Rule of Evidence 801(d)(2)(E). To admit statements under this rule, the court must find by a preponderance of the evidence "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Al-Moayad*, 545 F.3d 139, 173 (2d Cir. 2008) (citation omitted).

The Court reserved judgment on the motions, and admitted the statements conditionally, following the protocol established in *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969) and *United States v. Tracy*, 12 F.3d 1186 (2d Cir. 1993), as courts in this circuit regularly do. *See, e.g.*, *United States v. Chang*, No. 18-CR-681, 2024 WL 3303717, at *4 (E.D.N.Y. July 3, 2024). "Pursuant to *Geaney*, the court determines, after the evidence is in, whether the prosecution meets the foundational requirements under Rule 801 (d) (2) (E), *i.e.*, the existence of a conspiracy, the defendant's and the declarant's participation, and that the statements were made in further of the conspiracy." *Id.*

After the government rested, the Court heard argument on whether the government met its burden to show that the statements were admissible under Rule 801(d)(2)(E). (Tr. 1588–1609.) Ennab argued that the government had not shown by a preponderance of the evidence

that he was in a conspiracy with Elsayed or Amin. (Tr. 1589, 1605.) Both defendants argued that the government had not established a single conspiracy; instead, they claimed, there were multiple conspiracies, with each of Hassan's pharmacies involved in a separate conspiracy. (Tr. 1595.) According to the government, the evidence established that Hassan's pharmacies, Leticia Smith, and the crew chiefs were part of the same conspiracy to dispense and distribute oxycodone. (Tr. 1598.)

The Court ruled, outside of the jury's presence, that the government established by a preponderance of the evidence that Ennab, Hassan, Smith, Kent, Elsayed, Amin, and Saleh were members of a conspiracy, and that statements they made during the course of and in furtherance of the conspiracy were admissible under Rule 801(d)(2)(E). (Tr. 1630–34.) The Court precluded statements by other members of the Pharmacists United group chat, because the government did not establish that Ennab or Hassan were in a conspiracy with those declarants. (*Id.*) The Court instructed the jury that it could not consider statements by members of the Pharmacists United group chat — other than Hassan, Saleh, Amin, and Elsayed — against Ennab. (Tr. 2233.)

On February 12, 2025, the jury convicted the defendants of all counts. (*See* ECF No. 353.)

## LEGAL STANDARD

### I.    Rule 29 Motion for Acquittal

A court evaluating a Rule 29(c) motion views "the evidence in the light most favorable to the prosecution," and will uphold the jury's verdict if it determines that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (emphasis in original) (citation omitted); *see also United States v. Mahaffy*, 499 F. Supp. 2d 291, 294 (E.D.N.Y. 2007) ("To succeed, any Rule

14

29 motion must demonstrate that, viewing the evidence in the light most favorable to the government, no rational trier could have found the essential elements of the crime charged beyond a reasonable doubt." (internal quotation marks and citation omitted)), *aff'd*, 283 F. App'x 852 (2d Cir. 2008). "A defendant challenging the sufficiency of the evidence 'bears a heavy burden.'" *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021) (alteration adopted) (quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)). Viewing the evidence in the light most favorable to the prosecution means "drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (internal quotation marks and citation omitted). "Moreover, 'the evidence must be viewed in its totality, as each fact may gain color from others.'" *Landesman*, 17 F.4th at 319 (quoting *United States v. Cassese*, 428 F.3d 92, 98–99 (2d Cir. 2005)). "If the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *Id.* (alteration adopted) (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)).

However, "a conviction based on speculation and surmise alone cannot stand." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994). "Impermissible speculation . . . is 'a complete absence of probative facts to support the conclusion reached.'" *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)). "The jury's inferences . . . must be reasonable." *Landesman*, 17 F.4th at 320. "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Id.* (quoting *United States v. Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008)).

## II.    Rule 33 Motion for A New Trial

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  While the court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice," *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992), "'that discretion should be exercised sparingly' and only in the most extraordinary circumstances," *Landesman*, 17 F.4th at 330 (quoting *Sanchez*, 969 F.2d at 1414).  *See also United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995) ("Because motions for a new trial are disfavored in this Circuit the standard for granting such a motion is strict.").  "In considering whether to grant a new trial, a district court may itself weigh the evidence and the credibility of witnesses, but in doing so, it must be careful not to usurp the role of the jury." *United States v. Canova*, 412 F.3d 331, 348–49 (2d Cir. 2005).

The court should grant a Rule 33 motion only if "letting a guilty verdict stand would be a manifest injustice," because of "a real concern that an innocent person may have been convicted." *Ferguson*, 246 F.3d at 134 (internal quotation marks and citation omitted).  There is no manifest injustice "unless the judge is prepared to answer 'no' to the following question: 'Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?'" *United States v. Goldstein*, No. 21-CR-550, 2024 WL 556163, at *8 (E.D.N.Y. Feb. 12, 2024) (quoting *Sanchez*, 969 F.2d at 1414).

Accordingly, "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *United States v. Archer*, 977 F.3d

16

181, 188 (2d Cir. 2020) (quoting *Sanchez*, 969 F.2d at 1414).  Under the "preponderates heavily"

standard, "absent a situation in which the evidence was patently incredible or defied physical

realities, or where an evidentiary or instructional error compromised the reliability of the verdict,

a district court must defer to the jury's resolution of conflicting evidence." *Id.*  (alteration

adopted) (internal quotation marks and citations omitted).

## DISCUSSION

### I.    Motions for Acquittal

The defendants move for a judgment of acquittal under Rule 29(c).[13]  As explained

below, neither motion is persuasive.

#### a.  Ennab's Rule 29 Motion

Section 841(a)(1) criminalizes both distributing and dispensing controlled

substances.  Title 21, United States Code, Section 841 makes it illegal "[e]xcept as authorized,"

"to distribute or dispense, or possess with intent to . . . distribute or dispense, a controlled

substance."  21 U.S.C. § 841(a)(1).  "Distribute" means "to deliver (other than by administering

or dispensing) a controlled substance or a listed chemical."  21 U.S.C. § 802(11).  "Dispense"

means "to deliver a controlled substance to an ultimate user . . . by, or pursuant to the lawful

order of, a practitioner, including the prescribing and administering of a controlled substance and

the packaging, labeling or compounding necessary to prepare the substance for such delivery."

21 U.S.C. § 802(10).  *See United States v. Ekinci*, 101 F.3d 838, 842 (2d Cir. 1996) ("These

statutory definitions clearly indicate that 'distribute' and 'dispense' have different meanings

because 'distribute' is defined as a delivery other than by dispensing or administering.").

---

[13] As relevant here, a defendant may move for a judgment of acquittal pursuant to Rule 29(c) "within 14 days after a guilty verdict."  Fed. R. Crim. P. 29(c).  "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  *Id.*

While dispense and distribute have different statutory meanings, "there is no significant difference between dispensation and distribution" in the context of § 841 and § 846. *Ekinci*, 101 F.3d 838 at 1996. Ennab argues, however, that unlawfully dispensing and unlawfully distributing oxycodone are mutually exclusive under § 841(a) and on the facts presented at trial. The essence of his claim is that he could not have had the requisite mental state to participate in both a distribution and a dispensing conspiracy.[14] Ennab says that there are only two options: either he believed that a practitioner — Dr. Ratanaprasatporn — wrote the prescriptions, making the appropriate charge unlawfully dispensing, or he believed a non-practitioner — Smith — wrote the prescriptions, in which case unlawful distribution would be the appropriate charge. (ECF No. 394 at 17–20.)

As for the first option, Ennab claims that he could not have known that Smith was writing the prescriptions; at most, he says, he conspired to dispense, because he believed that Dr. Ratanaprasatporn, a licensed physician, issued the oxycodone prescriptions that he filled, and gave to Michael Kent. (*Id.* at 20–22.) Smith and Kent, on the other hand, could have been engaged only in a distribution conspiracy because they knew that a practitioner did not issue the prescriptions. (*Id.* at 22–23.)

To support his claim that he could not have known that Smith wrote the prescriptions, Ennab cites Smith's testimony that a pharmacist would not have known from the face of the prescription that Smith, not Dr. Ratanaprasatporn, issued it. (Tr. 521, 526–27.) He also points out that there was no direct evidence that he and Smith communicated, and that Smith did not know the name of the pharmacist at Forest Care. (Tr. 511–14.) In addition, he relies on a

---

[14] Hassan joins in this argument, but does not explain how it applies to him. (ECF No. 399-1 at 5.)

recorded phone call between Kent and Ennab, in which Kent told unindicted co-conspirator John Sanders not to let Ennab know he was on the line.  (GX 127.)

       Ennab says that the proof that he knew the prescriptions were bogus and that Kent was illegally distributing the oxycodone lends "equal, or nearly equal circumstantial support" to prove a dispensing conspiracy as it does to prove a distribution conspiracy.  (ECF No. 423 at 11 (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).)  He might have thought that the people in whose names the prescriptions were issued were addicts to whom Kent distributed the drugs.  (*Id.* at 11–12.)  Ennab concludes that if "the evidence was 'sufficient to prove that Ennab was [both] knowingly dispensing **and** distributing oxycodone,' then it is not sufficient to prove either because the two require opposing mental states."  (*Id.* at 12 (quoting ECF No. 409 at 43).)

       The reasoning goes like this: when Ennab gave Kent the oxycodone, Ennab intended to deliver oxycodone illegally to the user by a prescription that was issued for an illegitimate purpose or to deliver oxycodone to a drug dealer who would not give the oxycodone to the patient for whom it was prescribed.  But, according to Ennab, it cannot be both.  Because he could not also have conspired to distribute oxycodone, he argues, the Court should not have admitted Smith's and Kent's statements against him as co-conspirator statements.  (ECF No. 394 at 22–24.)  He concludes that without those statements, the evidence was not sufficient to convict him of anything.  (*Id.* at 25.)[15]  Ennab also argues that he did not conspire with Amin or Elsayed and that the evidence was not sufficient to prove his criminal intent.  (*Id.* at 19–20.)

---

[15] Ennab also argues that because the government relied on the same conduct to charge Ennab with both conspiracies, it avoided a double jeopardy issue only by pursuing an "indictment and theory of the case that made the different conspiracies turn on who the conspirators believed issued the prescriptions." (ECF No. 394 at 17.)  Ennab did not raise double jeopardy concerns before or during trial.  He now reasons that "[t]he two conspiracy counts are not multiplicitous," but asserts that "[i]f, however, the

The government responds that the evidence established that Ennab conspired to dispense and distribute oxycodone, that it proved his participation in both conspiracies beyond a reasonable doubt, and that there is no constitutional impediment to his conviction for those crimes.

The government agrees that nonpractitioners like Smith and Kent could only personally distribute oxycodone, because they were not doctors or pharmacists.  (ECF No. 409 at 38.)  They could, however, aid and abet pharmacists and doctors in dispensing oxycodone illegally, and they could also conspire to dispense oxycodone.  (*Id.*)  The government maintains that the same logic applies to Ennab.  He could dispense oxycodone himself, but could also aid and abet and conspire with others, including Smith and Kent, to distribute oxycodone.  (*Id.*)

The government's theory has consistently been that the conspirators had two objects: to dispense oxycodone and to distribute it.  (*Id.* at 37.)  These objects were related; dispensing the oxycodone furthered the distribution of oxycodone.  (*Id.* at 38.)  Smith and Kent conspired to distribute oxycodone, and Ennab, according to the government, joined that conspiracy.  The conspirators accomplished their object — distributing oxycodone — by conspiring with pharmacists who dispensed oxycodone, a conspiracy that Ennab also joined.  (*Id.*)  The government says that it proved Ennab's knowing participation in the distribution conspiracy in two ways: first, that he knew that Smith, not Dr. Ratanaprasatporn, issued the prescriptions; and

---

Government now combats this motion for a judgment of acquittal by arguing facts or theories that would render the counts multiplicitous, that multiplicity would not have been 'reasonably available' before trial and so need not have been raised before trial under Fed R. Crim. P. 12." (*Id.* at 17.)  "[T]o survive a double jeopardy attack, the government would have to show that the two schemes involved 'distinct' agreements."  *United States v. Gaskin*, 364 F.3d 438, 454 (2d Cir. 2004) (quoting *United States v. Lopez*, 356 F.3d 463, 467 (2d Cir.2004)).  Ennab's argument that the conspiracy charges do not raise a double jeopardy issue only because "the different conspiracies turn[ed] on who the conspirators believed issued the prescriptions," (ECF No. 394 at 17), is unconvincing.  There was sufficient evidence for the jury to conclude that the two conspiracies involved distinct agreements — one to distribute oxycodone and one to dispense it.

second, that he knew he was not dispensing oxycodone to real patients, and Kent was selling or otherwise illegally distributing the oxycodone that Ennab dispensed.  (*Id.* at 40.)

Ennab's claim that he could not be convicted of conspiring to dispense and to distribute because they are "mutually exclusive" is not persuasive.  As far as the Court is aware, there is no authority for that proposition.  The Second Circuit has said that there may not be a significant difference between distribution and dispensing.  *See Ekinci*, 101 F.3d 838, 842 (2d Cir. 1996).  While the court also observed that "dispense" and "distribute" have different definitions, that does not mean that Ennab could not both conspire to distribute and conspire to dispense oxycodone.  Indeed, as Ennab concedes — and as the Court instructed the jury — a defendant can dispense narcotics to further a distribution conspiracy.  (*See* ECF No. 394 at 21.)  And as the government points out, Ennab could both dispense oxycodone and aid and abet Kent's distribution of oxycodone.  (ECF No. 409 at 38.)  Similarly, while Smith and Kent could not dispense oxycodone as non-practitioners under the statute, they could aid and abet Ennab in unlawfully dispensing oxycodone.

Nevertheless, Ennab maintains that his conviction cannot stand because there was "no evidence at all that [he] knew that the prescriptions were actually issued by Ms. Smith."  (ECF No. 394 at 20.)  Even if that is true, there was more than sufficient evidence for a rational jury to find that Ennab knowingly conspired to distribute oxycodone.  Ennab's dealings with Kent had none of the signs of a pharmacist-patient relationship, and all of the signs of a narcotics conspiracy.  Ennab had no interaction with the supposed patients at all.  He got their identifications from Kent, who was not a doctor.  (GX 1112-1.4.)  The identifications showed that the patients did not live in Staten Island.  (*Id.*)  While Kent used bogus Staten Island addresses, Ennab had access to the identifications, which had Brooklyn addresses.  (GX 911; GX

1112-1.4.)  Each "patient" had the same telephone number — Kent's.  (Tr. 467.)  And each "patient" was prescribed the same dosage — 30 milligrams — and the same number of pills — 120, (GX 911) — a combination that was inconsistent with the guidance that oxycodone should be prescribed for a short period in the lowest possible dose, and that was characteristic of diversion.

Equally incriminating were Ennab's conversations with Kent, for example about exchanging white oxycodone pills for blue ones because Kent "[couldn't] do nothing with those," (GX 127), and about "moving" patients to other pharmacies (GX 126).  When Kent picked up the prescriptions, he gave Ennab a wad of cash, which Ennab did not bother to count, and put in his pocket instead of in the pharmacy register.  (GX 953.)  Ennab also represented that he counseled certain "patients" about the prescriptions (GX 357), which was impossible, and that the cost of the oxycodone was charged to their insurance, even though Kent picked up the prescriptions and paid for them in cash (GX 241; GX 953).

Because there was ample evidence that Ennab conspired to distribute and dispense, his co-conspirator's statements were properly introduced against him.  But even without the evidence of Smith's and Kent's statements, the evidence was more than sufficient to support the jury's conclusion that Ennab was guilty.  Accordingly, Ennab's motion for acquittal is denied.

**b.  Hassan's Rule 29 Motion**

Hassan also argues that the evidence at trial was not sufficient to establish his guilt.  The record refutes that claim.

"A jury's verdict must be upheld 'if, crediting every inference that could have been drawn in the government's favor and viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Hild*, 147 F.4th 103, 109 (2d Cir. 2025) (quoting

22

*United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021)). "Deference to the jury is especially important in the context of conspiracy convictions, as a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Guldi*, 141 F.4th 435, 444 (2d Cir. 2025) (internal quotation marks and citation omitted).

"[A] defendant's knowledge of the conspiracy and his participation in it with criminal intent may be established through circumstantial evidence." *United States v. Gordon*, 987 F.2d 902, 906–07 (2d Cir. 1993). There was ample evidence — including testimony, documentary evidence, and recordings — from which a rational jury could conclude that Hassan was an active participant in the crimes charged, that he knew that pharmacists at his pharmacies were filling prescriptions illegally, and that he encouraged it. The evidence demonstrated that Hassan was in contact with Leticia Smith, and that his purpose in contacting her was to facilitate the crimes charged. At one point while he was the pharmacist at Nile Rx, he told Smith that she had to send "other medications . . . with the oxycodone 30 milligrams because if it didn't, it could get red-flagged." (Tr. 408.) According to Hassan, a reasonable jury could only have concluded that Smith spoke to a different Nile Rx pharmacist. (ECF No. 399-1 at 11–12.) But Smith testified that she spoke to Hassan, who identified himself as the pharmacist at Nile Rx. (Tr. 423; 760.) Phone records also confirmed that the phone number of the Nile Rx pharmacist Smith saved in her phone was Hassan's. (GX 659; GX 3.) Based on this evidence, a rational juror could conclude that Hassan was the Nile Rx pharmacist who told Smith how to prevent red flags that could alert authorities to their scheme.

According to Smith, Hassan never verified the prescriptions with Dr. Ratanaprasatporn. (Tr. 408.) He set up fake insurance profiles to obscure that his pharmacies were filling

oxycodone prescriptions for which Kent paid cash (Tr. 1273–74), and discussed the need to "shift[]" Smith's oxycodone prescriptions "to other stores" in text messages (Tr. 1489; GX 1103-2.36).  While Hassan informed members of a group chat that he had "discontinued all of Dr. Somsris [sic] patients in both Nile Rx and Nile Ridge" and urged them to "be diligent in doing PMP checks and id verifications" for patients with prescriptions from her office (GX 617), a rational jury could justifiably conclude that he was simply creating a front, especially since his pharmacies continued to fill these prescriptions.  (*See* GX 241.)

In addition, the jury knew from Amin that Hassan knew Kent (Tr. 1252–53), and that Amin and Hassan split the cash with which Kent paid for the prescriptions (Tr. 1260).  The government also introduced a note Kent left for Hassan at Downtown Rx with his phone number and "Michael . . . for Ms. Smith," which a reasonable jury could conclude proved that Hassan knew that Smith and Kent were working together.  (Tr. 1468; GX 1103-2.14.)  Viewing all of this evidence together, the jurors could conclude that Hassan knew that his pharmacies were illegally dispensing oxycodone.  Accordingly, his motion for acquittal is denied.

\*      \*      \*

The Court has "examine[d] the entire case, take[n] into account all facts and circumstances, and [made] an objective evaluation."  *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *Ferguson*, 246 F.3d at 134).  "[V]iewing the evidence in the light most favorable to the prosecution," "deferring to the jury's assessment of the witnesses' credibility," and considering the evidence "in its totality, not in isolation," the Court finds that the defendants have not sustained the "heavy burden" required for relief under Rule 29. *Id.* (citations omitted).

## II.    Motion for a New Trial

The defendants also move for a new trial under Rule 33.  The court has "broad discretion
. . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice,"
but that discretion should be exercised "sparingly and in the most extraordinary circumstances."
*Ferguson*, 246 F.3d at 133–34 (internal quotation marks and citation omitted).  The defendants'
arguments provide no basis for this extraordinary relief.

### a.    Ennab's Rule 33 Motion

Ennab asserts that he was not in the same conspiracy as Amin and Elsayed, so Amin and
Elsayed's statements should not have been admitted against him as co-conspirator statements.
He also argues that the government knowingly elicited false testimony from Amin and
improperly used evidence to create "false impressions" and draw "specious inferences."

### i.    *Hearsay / Nature and Scope of the Conspiracy*

As explained above, a statement is not hearsay if it is "offered against an opposing party
and . . . was made by the party's coconspirator during and in furtherance of the conspiracy."
Fed. R. Evid. 801(d)(2)(E).  "Pursuant to that rule, a district court may admit an out-of-court
declaration that would otherwise be hearsay if it finds 'by a preponderance of the evidence (a)
that there was a conspiracy, (b) that its members included the declarant and the party against
whom the statement is offered, and (c) that the statement was made during the course of and in
furtherance of the conspiracy.'"  *United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012)
(quoting *United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011)).

According to the government, the conspiracy in this case was a hub and spoke
conspiracy.  (ECF No. 409 at 57–58.)  "In a hub-and-spoke (or 'wheel') conspiracy, one person
typically acts as a central point while others act as 'spokes' by virtue of their agreement with the
central actor."  *United States v. Ulbricht*, 31 F. Supp. 3d 540, 554 (S.D.N.Y. 2014).  "The key

question in determining 'whether the spoke participants may be found to be members along with the core conspirators depends on whether or not the 'spokes' knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other spoke participants.'" *United States v. McMahon*, No. 21-CR-265, 2024 WL 896838, at *17 (E.D.N.Y. Mar. 1, 2024) (quoting *United States v. Pauling*, 256 F. Supp. 3d 329, 335 (S.D.N.Y. 2017)).

When a conspiracy includes members who are unknown to each other, "it is permissible for the jury to find that there was a single conspiracy so long as a reasonable juror could conclude beyond a reasonable doubt (1) that the scope of the criminal enterprise proven fits the pattern of the single conspiracy alleged in the indictment, and (2) that the defendant participated in the alleged enterprise with a consciousness of its general nature and extent." *United States v. Eppolito*, 543 F.3d 25, 47–48 (2d Cir. 2008) (internal quotation marks and citations omitted). "To prove a single conspiracy in such a situation, the Government must show that there was a 'rim' around the spokes, such that the 'spokes' became coconspirators with each other." *Ulbricht*, 31 F. Supp. 3d at 554. "In the absence of such a 'rim,' the spokes are acting independently with the hub; while there may in fact be multiple separate conspiracies, there cannot be a single conspiracy." *Id.*

Here, there was sufficient evidence of the existence of conspiracies to dispense and distribute oxycodone and Ennab's knowing participation in those conspiracies. At trial, pursuant to the *Geaney* protocol, the Court found that the government established by a preponderance of the evidence that Ennab was a member of an overarching narcotics conspiracy that included at least Smith, Kent, Hassan, Amin, El Sayed, and Saleh. (Tr. 1631–32.) Using the hub and spoke analogy, the Court explained that one way to conceptualize the conspiracy was that "[t]he hub can be described as Kent and Smith . . . [and] that the Hassan pharmacies are one spoke and

26

Hassan is the rim around that, around that particular conspiracy." (Tr. 1631.) Rather than "acting independently with the hub," *Ulbricht*, 31 F. Supp. at 554, each of Hassan's pharmacies and the men who ran them were acting with the common goal of illegally dispensing and distributing oxycodone.[16]

As detailed above and as the Court concluded at trial, there was "substantial evidence," including video surveillance footage, wiretapped phone calls, and text messages, that Ennab and Kent conspired to dispense and distribute oxycodone illegally. (Tr. 1632.) There was also sufficient evidence that Ennab and Hassan were members of the same conspiracies. Smith testified that she sent prescriptions to Forest Care at Kent's suggestion, and that Kent informed her that according to Hassan, Ennab would fill the prescriptions. (Tr. 457.)

The evidence also established that Amin and Elsayed were members of these conspiracies. Elsayed and Amin spoke with Kent by phone about oxycodone prescriptions from Linden Medical. (GX 118; GX 119.) Video evidence showed that Kent picked up those prescriptions from Amin and Elsayed's pharmacies. (GX 951; GX 952.) Hassan texted Elsayed, "Omar I spoke to Mike . . . He will send u four new patients." (GX 1103-2.30.) One minute earlier, Kent called Ennab for the first time. (GX 924.) Kent told Smith to send prescriptions to Forest Care at Hassan's direction. (Tr. 457.) And Hassan had ownership interests in Ennab's, Amin's, and Elsayed's pharmacies. (GX 261.) Hassan's involvement — and his connections to

---

[16] The government argues that the conspirators had the common purpose of "making money for Hassan's network of pharmacies." (ECF No. 409 at 59.) Ennab takes issue with this because "Mr. Ennab didn't seek to make money for any pharmacy other than his own: Forest." (ECF No. 424 at 6.) Ennab says that this is sufficient to show that he was not in a conspiracy with Amin or Elsayed. (*Id.*) Even if Ennab's primary concern was to enrich himself, however, that does not mean he was not part of the conspiracy. As the Second Circuit has explained, "the participants' goals need not be congruent for a single conspiracy to exist, so long as their goals are not at 'cross purposes.'" *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1192 (2d Cir. 1989) (quoting *United States v. Heinemann*, 801 F.2d 86, 92 n.1 (2d Cir. 1986)).

Amin, Elsayed, and Ennab — is "evidence of 'interrelationship and interdependency.'" *McMahon*, 2024 WL 896838, at *18 (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191) (2d Cir. 1989)).

There was also evidence that Ennab and Kent discussed shifting oxycodone prescriptions out of Forest Care to other pharmacies. (*See* GX 125-A.) Citing *Blumenthal v. United States*, 332 U.S. 539 (1947), and *United States v. Barnes*, 604 F.2d 121 (2d Cir. 1979), the government argues that this discussion established Ennab's knowledge that "Kent was handling a larger quantity of oxycodone prescriptions than what Ennab could or would fill," which is sufficient to prove that Ennab "had reason to know of other spoke participants, even if he did not know their identity." (ECF No. 409 at 59.)

In *Blumenthal*, the government alleged that the defendants conspired to sell two carloads of whiskey at prices above a ceiling set by the government. 332 U.S. at 542. The defendants each purchased the whiskey from a single supplier and sold it to others. *Id.* at 558. The Supreme Court concluded that this evidence established a single conspiracy: "True, each salesman aided in selling only his part. But he knew the lot to be sold was larger and thus that he was aiding in a larger plan." *Id.* at 559.

The defendants in *Barnes* were charged with conspiracy to violate narcotics laws by possessing and distributing heroin and cocaine. 604 F.2d at 131. The evidence showed that the criminal organization was "loosely knit," but that "several aspects of its operations serve[d] to define a core group of wholesalers and retailers." *Id.* at 155. For example, the government proved that the criminal organization's operations centered in two car garages that also stored cars the defendants used, which were registered to the same companies. *Id.* The Second Circuit found that "retailers whose existence is actually unknown to each other can be held to have

28

agreed in a single conspiracy if each knew or [h]ad reason to know that other retailers were involved in a broad project for the importation, distribution, and retail sale of narcotics and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture." *Id.*

Here, it was reasonable for the jury to conclude that Ennab knew that he was "aiding in a larger plan" with Hassan's other pharmacies. Ennab asked Kent to move oxycodone prescriptions out of Forest Care, which demonstrates his knowledge that other pharmacies would be filling the bogus prescriptions. That is corroborated by Smith's testimony that according to Kent, Hassan and Ennab discussed starting to send prescriptions from Linden Medical to Forest Care. (Tr. 457.) In sum, the evidence at trial established that Ennab was part of the same conspiracies to distribute and dispense oxycodone as Smith, Kent, Hassan, Amin, and Elsayed. Accordingly, Amin and Elsayed's statements were properly admitted under Rule 801(d)(2)(E).

ii.    *Amin's Testimony*

On direct examination, Amin testified that "[a]t one point there were at least five or six individuals, their prescriptions were not coming to Prospect Care. So when I asked Michael Kent what's going on with those guys, he told me that he was supposed to pick it up at Staten Island or Atlantic Avenue pharmacies." (Tr. 1238.) Amin also testified that Kent told him that "Mo, referring to Mohamed Hassan, . . . directed him to go to these locations." (Tr. 1239.) Ennab argues that this testimony created the false impression that Ennab was "working in tandem with Amin at Prospect and Elsayed at Downtown to hide oxycodone distribution and dispensing conspiracies." (ECF No. 395 at 14.)

Citing a spreadsheet of Dr. Ratanaprasatporn's controlled substance prescriptions (GX 241), Ennab argues that Amin's testimony was false because Prospect Care, Downtown Rx, and Forest Care did not share any patients in common, and no patients had been shifted from

Prospect Care to Downtown Rx or Forest Care.  (ECF No. 395 at 14–15.)  Ennab also says that Amin must have been lying because "*none* of Prospect's Ratanaprasatporn patients moved away in August or September of 2022," making it "unlikely that Amin ever asked Kent about 'five or six patients' that had stopped coming to Prospect."  (ECF No. 395 at 15 (emphasis in original).)  He also maintains that the government should have known the testimony was false.  (ECF No. 395 at 18.)

The government responds that there is no evidence that Amin's statement was false, and thus no evidence that the government knew it was false.  (ECF No. 409 at 48.)  The government argues in any event that Amin's testimony was immaterial because other evidence at trial "powerfully corroborated" that Kent, Hassan, Amin, and Ennab were part of the "same scheme." (ECF No. 409 at 51.)

The Court finds that there is no evidence that Amin was lying when he testified that Kent told him that Hassan was shifting oxycodone patients to Staten Island and Atlantic Avenue pharmacies.  The fact that the prescriptions were not ultimately moved to Downtown Rx or Forest Care does not mean that Kent did not tell Amin that Hassan was planning to move them there.  As discussed above, some of the pharmacists, including Hassan, Elsayed, and Ennab, expressed concern about filling too many oxycodone prescriptions at one pharmacy.  The jury had the opportunity to review the evidence that Ennab cites — that "from April 2022 to October 2022, there was no Ratanaprasatporn patient at Prospect who stopped having prescriptions filled at Prospect" (ECF No. 424 at 17 (citing GX 241)) — and to consider Amin's testimony in light of that evidence.  *See United States v. McCourty*, 562 F.3d 458, 476 (2d Cir. 2009) ("It is the function of the jury to weigh the evidence and to assess the credibility of those witnesses who testify."); *id.* ("In short, where the resolution of the Rule 33 motion 'depend[s] on assessment of

the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.'" (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992), *abrogated on other grounds as noted in Yung v. Lee*, 432 F.3d 142, 147 (2d Cir. 2005))).

Further, "[e]ven where courts in this Circuit have clearly identified perjured testimony, they have refused to grant a new trial unless the court could find that the jury 'probably would have acquitted in the absence of the false testimony.'" *McCourty*, 562 F.3d at 476 (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir.1992)). "Where, however, the prosecution knew or should have known of the perjury prior to the conclusion of the trial, the conviction must be set aside where there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Scott*, No. 17-CR-630, 2023 WL 6064329, at *6 (S.D.N.Y. Sep. 14, 2023), *aff'd sub nom. United States v. Greenwood*, No. 23-7199, 2025 WL 354692 (2d Cir. Jan. 31, 2025), *cert. denied sub nom. Scott v. United States*, No. 25-90, 2025 WL 2824179 (U.S. Oct. 6, 2025) (internal quotation marks and citation omitted).

As explained above, the record does not establish that Amin lied, but even if it did, Rule 33 relief would only be justified if the jury "probably would have acquitted" Ennab absent the testimony. *Sanchez*, 969 F.2d at 1413–14. Ennab has not made this showing. There was sufficient other evidence, including video surveillance footage and recorded phone calls, for the jury to convict Ennab. As a result, he is not entitled to a new trial.

**b.    Hassan Rule 33**

Hassan makes three arguments in support of his Rule 33 motion.[17]  First, he argues that the Court should not have admitted Rule 404(b) evidence against him because it was "too

---

[17] Hassan also argues that "the actual evidence showing Mr. Hassan's knowledge fell too short for purposes of Rule 33 and should warrant a new trial where he can be judged based on reliable evidence and not speculation." (ECF No. 399-2 at 11.)  For the reasons discussed above, the Court concludes

confusing for a jury." (ECF No. 399-2 at 30.) Second, he contends that the Court should not have given a conscious avoidance instruction. (*Id.* at 39.) Finally, he asserts that the government purposely elicited false and improper testimony from Amin, and mischaracterized Amin's testimony in summation. (*Id.* at 43–45.)

### i. *Rule 404(b) Evidence*

Under Rule 404(b), "[e]vidence of any other crime, wrong, or act" is not admissible to show a defendant's character but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1), (2). The Second Circuit follows the "inclusionary" approach to 404(b), admitting other acts evidence unless it is "introduced for the sole purpose of showing the defendant's bad character, . . . [is] overly prejudicial under Fed. R. Evid. 403[,] or not relevant under Fed. R. Evid. 402." *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996).

Hassan argues that the Court should have excluded evidence of his "optimization practices" — his instruction that Smith and others issue prescriptions for profitable prescriptions that were reimbursable by insurance. (ECF No. 399-2 at 30.) Smith testified that Hassan asked her to send high-cost medications to Downtown Rx with the oxycodone prescriptions (Tr. 756), and that he made similar requests when he was the pharmacist at Nile Rx (Tr. 408). Amin testified that Hassan suggested asking Kent to bring in prescriptions for medication and medical equipment that are "highly reimbursable." (Tr. 1265.) The government also introduced text messages in which Hassan instructed Elsayed to tell a patient to switch to Downtown Rx, and that he would not dispense "a single tablet of oxycodone" without accompanying high-cost medications. (Tr. 1460; GX 1103-2.12.) Hassan also discussed high-cost medications in the

---

there was sufficient evidence to prove Hassan's knowledge and declines to grant his Rule 33 motion on this basis.

Pharmacist United group chat, writing "[i]t's frustrating when I get a call that a store is not making any money and I check the system and I find that no profitable scripts are being sought out." (GX 1103-7.5.)

The Court gave the following limiting instruction to the jury under 404(b):

> [Y]ou may consider evidence of Mr. Hassan's uncharged conduct only for the limited purposes that I'm going to describe for you now.
>
> First, as evidence explaining the background and nature of the relationship between Mr. Hassan and others with whom he is charged with carrying out the charged crimes and the formation and development of the relationship between and among them.
>
> You may consider this evidence as evidence of the development of relationships of mutual trust between Mr. Hassan and others with whom he is charged with carrying out the charged crimes.
>
> You may consider this evidence as evidence of conduct that is inextricably intertwined with evidence of the charged crimes. You may consider it as evidence enabling you to understand the narrative of the charged crimes. And you may consider the evidence as corroborating the testimony of other witnesses.
>
> You may not consider evidence of Mr. Hassan's uncharged conduct for any other purpose other than those that I have just described and you may not consider evidence of Mr. Hassan's uncharged conduct against Mr. Ennab for any reason or in any way.

(Tr. 2209–10.)

Hassan's complaints are unconvincing. The optimization evidence explained the background and nature of the relationship between Hassan, Smith, Amin, and Elsayed, evidence that is admissible under Rule 404(b). *See United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992). The evidence was also inextricably intertwined with evidence of the crimes with which Hassan was charged and completed the narrative of the case. Again, this was proper. *See United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994). Finally, despite Hassan's arguments to the

33

contrary, the Second Circuit has held that such evidence "has been consistently held admissible to corroborate crucial prosecution testimony." *United States v. Everett*, 825 F.2d 658, 660 (2d Cir.1987); *see also United States v. Williams*, 577 F.2d 188, 192 (2d Cir. 1978) (noting that evidence of other acts may be admissible under Rule 404(b) "even if the trial court finds that such evidence is relevant only for corroboration purposes, provided that the corroboration is direct and the matter corroborated is significant"); *United States v. Cadet*, 664 F.3d 27, 32 (2d Cir. 2011) (listing "corroboration of witnesses" as one of the acceptable "non-propensity purposes" for admitting other act evidence under Rule 404(b)); *Carroll v. Trump*, 124 F.4th 140, 169 (2d Cir. 2024) ("Evidence of a pattern may also be relevant for the non-propensity purpose of corroborating witness testimony."). Accordingly, the evidence was properly admitted.

### ii. *Conscious Avoidance Instruction*

"A conscious avoidance instruction is properly given '(i) when a defendant asserts the lack of some specific aspect of knowledge required for conviction, and (ii) the appropriate factual predicate for the charge exists, *i.e.*, the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.'" *United States v. Ramirez*, 320 F. App'x 7, 10–11 (2d Cir. 2009) (quoting *United States v. Aina–Marshall*, 336 F.3d 167, 170 (2d Cir.2003)).

Hassan argues that a conscious avoidance instruction may have been appropriate for Ennab, who personally filled prescriptions for Kent, but that the Court should not have given one for Hassan because there was no evidence that he filled prescriptions himself, interacted with Kent or Smith about any prescriptions other than those issued for a single patient, or that he

knew Smith was issuing prescriptions without Dr. Ratanaprasatporn's knowledge or authorization. (ECF No. 399-2 at 41.)[18]  The record demonstrates otherwise.

In fact, there was ample evidence that Hassan knew that his pharmacies were diverting oxycodone, and even if he did not know, that he consciously avoided knowing.  Kent left him a note at Downtown Rx with his phone number and the message "for Ms. Smith."  (GX 1103-2.14.)  Hassan texted with Elsayed and others that Kent would be "send[ing] u four new patients," (GX 1103-2.30), and about Smith's instructions not to send prior authorizations to Linden Medical "so Md doesn't say anything" (GX 1103-2.21).  Hassan also discussed in text messages limiting the number of patients with Linden Medical prescriptions and shifting them to other stores.  (*See* GX 1103-3.10; GX 1103-2.36.)  Hassan was clearly aware of issues with Linden Medical as early as February 2020, but allowed his pharmacies to continue filling their prescriptions.  (*See* GX 617; GX 241.)  Therefore, the conscious avoidance instruction was not erroneous.

In any event, even if there were an error — and there was not — it was harmless because of the compelling evidence, discussed above, that Hassan actually knew what was going on.  "[A]n unwarranted conscious avoidance instruction is harmless error where there is 'overwhelming evidence' of actual knowledge."  *Aina–Marshall*, 336 F.3d at 171 (2d Cir. 2003) (quoting *United States v. Ferrarini*, 219 F.3d 145, 157 (2d Cir. 2000)).

---

[18] At trial, Hassan objected to the conscious avoidance instruction because "[t]he government has argued that Mr. Hassan had actual knowledge of the charged crimes and was a willing participant.  There is no reasonable view of the evidence presented by the government of Mr. Hassan consciously avoiding anything."  (ECF No. 347 at 2.)  Citing *United States v. Hopkins*, 53 F.3d 533, 542 (2d Cir. 1995), the Court included the instruction over Hassan's objection, reasoning that "[e]ven if the Government's theory is that the defendant had actual knowledge, the Government is also permitted to claim in the alternative that if [the] defendant did not have that knowledge, it was only because he deliberately avoided it."  (Tr. 1855.)

### iii.    Amin's Testimony

Like Ennab, Hassan claims that Amin was lying when he testified that Kent told him that Hassan directed that prescriptions be moved from Prospect Care to pharmacies on Staten Island or Atlantic Avenue.  (ECF No. 399-2 at 25–26, 43.)  As explained above, the record does not establish that Amin was lying, and even if he was, Hassan has not shown that the jury "probably would have acquitted" him if the testimony had not come in.  *Sanchez*, 969 F.2d at 1413–14.

Hassan also objects to the testimony Amin gave on re-direct examination:

Q    As you sit here today, based on all your interactions with him, are you absolutely clear that Mohamed Hassan agreed with you to sell oxycodone to Kent?

A    Yes.

Q    Do you have any doubt about that whatsoever?

A    No.

Q    Are you absolutely clear based on all your interactions with him that Mohamed Hassan had Kent work with others in Mr. Hassan's pharmacies?

A    I have no doubt.

Q    Are you absolutely clear based on all of your interactions with him, that Mohamed Hassan had Kent bring prescriptions to Staten Island?

A    Yes.

Q    Do you have any doubt about that whatsoever?

A    No.

(Tr. 1397.)[19]

---

[19] Hassan did not object to this line of questioning during Amin's testimony.  Before Amin testified, Hassan filed a motion in limine seeking to exclude testimony about Amin's opinions or impressions of Hassan's knowledge.  (*See* ECF No. 337.)

36

Hassan now argues that the government "asked [Amin] to give an opinion that was <u>not</u> helpful for the jury in part because it necessarily called for some degree of legal opinion."  (ECF No. 399-2 at 43 (emphasis in original).)

As an initial matter, the government's questions were appropriately responsive to counsel's questions on cross examination:

> Q    And Mr. Hassan's — the conversations you had with Mr. Hassan wherein you say he agreed with you to distribute oxycodone with Michael Kent and Leticia Smith, those conversations, the only thing we have regarding those conversations is you saying they happened, correct?
>
> . . .
>
> A    Can you repeat that question?
>
> Q    Other than you saying that you agreed with Mohamed Hassan to distribute oxycodone with Michael Kent and Leticia Smith, you're not aware of any other evidence of that occurring, correct?
>
> A    I don't know.

(Tr. 1391.)

The government's examination on redirect was a proper response to these questions.

Nor is relief required on any other basis.  Under Federal Rule of Evidence 701, lay witnesses are permitted to give opinion testimony as long as it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Rule 704 further provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," except that "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."  Fed. R. Evid. 704.  Accordingly, "the fact that a lay witness's opinion testimony might

go to an ultimate issue in this case does not, by itself, mean that it must be precluded." *United States v. Awadallah*, 401 F. Supp. 2d 308, 313 (S.D.N.Y. 2005), *aff'd*, 436 F.3d 125 (2d Cir. 2006). "[T]here are two express preconditions to its admissibility: first, the opinion evidence may be allowed only if the court finds that the opinion is 'rationally based on' the witness's own perceptions; and second, it is to be allowed only if the court concludes that it will be 'helpful' to a clear understanding of the witness's testimony or the determination of a fact in issue." *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992).

Hassan does not argue that Amin lacked firsthand knowledge about Hassan's role. Indeed, Amin testified that he and Hassan split the cash that Kent gave them for the oxycodone prescriptions and discussed having Kent bring in prescriptions for highly reimbursable medications in addition to oxycodone, that Hassan showed Amin how to create fake insurance profiles for Kent's patients, and that he saw Hassan and Kent interact at Prospect Care. (Tr. 1252–53, 1260, 1265, 1273–74.) This was sufficient to satisfy the first requirement of Rule 701. *See Rea*, 958 F.2d at 1216 ("There are a number of objective factual bases from which it is possible to infer with some confidence that a person knows a given fact. These include what the person was told directly, what he was in a position to see or hear, what statements he himself made to others, conduct in which he engaged, and what his background and experience were.").

Hassan claims that the testimony was "<u>not</u> helpful for the jury in part because it necessarily called for some degree of legal opinion." (ECF No. 399-2 at 43 (emphasis in original).) "[W]hen a witness has fully described what a defendant was in a position to observe, what the defendant was told, and what the defendant said or did, the witness's opinion as to the defendant's knowledge will often not be 'helpful' within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the

defendant knew." *Rea*, 958 F.2d at 1216.  It is true, of course, that the jurors could assess the evidence that formed the basis of Amin's opinion testimony and decide for themselves whether Hassan had agreed to distribute oxycodone with Kent.

"[P]ermitting a witness to give opinion testimony that is not helpful to the jury, is not an error of constitutional magnitude." *Rea*, 958 F.2d at 1220.  Any error is harmless if the court "can conclude that that testimony was 'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" *Id.* (quoting *Yates v. Evatt*, 500 U.S. 391, 392 (1991)).  As explained above, there was a wealth of evidence to support the jury's conclusion that Hassan knowingly joined the conspiracy.  Accordingly, even if Amin's brief testimony was error, it was harmless.

Finally, Hassan argues that the government mischaracterized Amin's testimony during its summation, and "used this misstatement to argue that Mr. Hassan had personal knowledge that Kent was working with Smith to dispense illegal oxycodone that Kent was working with Smith to dispense illegal oxycodone years before the wiretaps." (ECF No. 399-2 at 45.)  Hassan challenges the government's remark to the jury that "Amin told you that he saw Kent bring cash for oxy at Nile RX." (Tr. 1913.)  Hassan seems to misread the government's argument to be that Hassan saw Kent bring the cash to the pharmacy.  Since Hassan registered no objection to the comment when it was made, there was no opportunity for the government to respond to his current argument.  Nevertheless, the far more logical reading is that the government was saying that Amin saw Kent pay for prescriptions in cash.  After all, that is what Amin said in his testimony.  (*See* Tr. 1244.)  Moreover, there was abundant evidence that Hassan — who was the owner and supervising pharmacist of Nile RX and interacted with Kent — knew that his pharmacies were filling oxycodone prescriptions illegally, and actively encouraged it.  *See*

*United States v. Dohou*, 382 F. App'x 32, 34 (2d Cir. 2010) ("The arguments raised in closing referred to the testimony that was presented, and asked the jury to draw reasonable inferences from the proffered evidence.  Accordingly, the Government's closing argument was proper.").

In sum, none of Hassan's arguments for a new trial are persuasive.  Accordingly, his motion for a new trial is denied.

## CONCLUSION

For these reasons, the defendants' motions for a judgment of acquittal and for a new trial are denied.

**SO ORDERED.**

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
       December 15, 2025